FILED

2020 Nov-20  AM 10:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

### IN THE UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

|  |  |  |
|---|---|---|
| NATHANIEL LARD, | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | **CIVIL ACTION** |
| ANDREW SAUL, | ) | **NO. 7:19-CV-1829-KOB** |
| ACTING COMMISONER | ) | |
| OF SOCIAL SECURITY, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On January 11, 2016, the claimant, Nathaniel Lard, filed an application for supplemental social security income under Title XVI of the Social Security Act. (R. 27). The claimant alleged disability beginning on June 15, 2015. (R. 27). He alleges disability because of attention deficit hyperactive disorder (ADHD), explosive personality disorder, and intellectual disorder. (R. 30). The Commissioner denied the claimant's application on July 26, 2016, and the claimant filed a request for a hearing before an Administrative Law Judge on September 22, 2016. (R. 27). The ALJ held a video hearing on February 9, 2018. (R. 27). Following the hearing, the ALL requested that the claimant undergo a further consultative evaluation with Dr. David W. Blanton on March 28, 2018.  Then, on April 27, 2018, the claimant requested further psychological evaluation, including objective IQ testing. (R. 27, 240).

In a decision dated October 22, 2018, the ALJ denied the claimant's request for further psychological evaluation and found that the claimant was not disabled under the Social Security Act and, therefore, ineligible for social security benefits. (R. 38).

After the decision, Dr. Jonathan Goff evaluated the claimant at the request of the claimant's attorney. The claimant submitted Dr. Goff's report to the Appeals Council as part of his request for review. The Appeals Council found that Dr. Goff's report did not show a reasonable probability of changing the outcome of the ALJ's decisions and denied the claimant's request for review on September 13, 2019. (R. 1-3).

Consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 3). The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court REVERSES AND REMANDS the decision of the Commissioner.

## II. **ISSUES PRESENTED**

Whether the Appeals Council erred in finding that Dr. Goff's opinion did not create a reasonable probability of changing the ALJ's decision.[1]

## III. **STANDARD OF REVIEW**

The standard for reviewing the Commissioner's decision is limited. This court must affirm the ALJ's decision if she applied the correct legal standards and if substantial evidence supports her factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir.1987).

---

[1] The claimant raised two other issues regarding whether he met Listing 12.05B and whether the ALJ failed to fully and fairly develop the record. However, because this court will reverse on this issue, it will not address those other issues.

"No . . . presumption of validity attaches to the [ALJ's] legal conclusions, including determination of the proper standards to be applied in evaluating claims*." Walker*, 826 F.2d at 999. This court does not review the ALJ's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets a Listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [ALJ]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. **LEGAL STANDARD**

*Refusal to Review based on Post-Hearing Evidence*

Generally, new evidence may be admissible at each stage of the administrative process.
*Washington v. Soc. Sec. Admin., Comm'r,* 806 F.3d 1317, 1320 (11th Cir. 2015);  *See also*
20 C.F.R. § 404.900(b).  When the claimant submits evidence to the Appeals Council that is
"new, material, and chronologically relevant," the Appeals Council must consider it.
*Washington,* 806 F.3d at 1317. Evidence counts as "new" if it is noncumulative. *Clough v. Soc.
Sec. Admin., Comm'r*, 636 F. App'x 496, 498 (11th Cir. 2016). Evidence counts as "material" if
a reasonable possibility exists that the evidence would change the administrative result.
*Washington*, 806 F.3d at 1321.

Medical examinations that are conducted after an ALJ's decision may still be
chronologically relevant if they relate back to a time on or before the ALJ's decision.
*Washington*, 806 F.3d at 1321. If the Appeals Council considers the evidence and adds it to the
record, it may deny review without articulating detailed findings. *Parks v. Comm'r, SSA*, 783
F.3d 847 (11th Cir. 2015).  When the Appeals Council erroneously refuses to consider evidence,
it commits legal error and remand is appropriate. *Id.*

*Intellectual Disorder under 12.05B*

Listing 12.05 "paragraph B" sets out criteria for establishing an intellectual disorder. To
meet Listing 12.05 "paragraph B," the claimant must satisfy the following three requirements:

> 1. Significantly subaverage general intellectual functioning evidenced by a
> or b:
>
> > a. A full scale (or comparable) IQ score of 70 or below on
> > an individually administered standardized test of general
> > intelligence; or

b. A full scale (or comparable) IQ score of 71-75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and

2. Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:

a. Understand, remember, or apply information (see 12.00E1); or
b. Interact with others (see 12.00E2); or
c. Concentrate, persist, or maintain pace (see 12.00E3); or
d. Adapt or manage oneself (see 12.00E4); and

3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

20 C.F.R. Pt. 404, Sub. P, App. 1, § 12.05.

For the purposes of determining general intellectual functioning under 12.05(B)(1), an IQ test must meet contemporary standards of validity, reliability, normative data, and scope of measurement and must be administered by a "qualified specialist." 20 C.F.R. Pt. 404, Sub. P, App. 1, § 12.05. A "qualified specialist" must be properly certified in the State where the IQ test was performed, and have the training and experience to administer, score, and interpret intelligence tests. *Id*. When the claimant's record includes multiple IQ scores, the regulations do not address which IQ score the ALJ should adopt in her analysis. *Wilbon v. Comm'r of Soc. Sec.*, 181 F. App'x 826 (11th Cir. 2006).

## V. **FACTS**

At the time ALJ rendered her final decision, the claimant was twenty-seven years old. He graduated from high school with an occupational diploma, after failing the graduation exam eight times. Following high school, the claimant attended community college, where he earned a certificate in industrial maintenance. The claimant has no past relevant work experience within

5

the meaning of the Social Security Act; however, the claimant worked in a paper mill and a car factory for a short period of time. The claimant alleges disability because of attention deficit hyperactive disorder (ADHD), explosive personality disorder, and intellectual disorder. (R. 30, 36, 223-25)

*Mental Impairments*

Records of the claimant's intelligence testing reach back to his childhood. The claimant first took the Universal Nonverbal Intelligence Test on November 23, 2002 when he was around eleven-years-old. Dr. Johnathan Goff administered the test, which measures exclusively nonverbal intelligence. The claimant scored an 82 on the memory component, a 69 on the reasoning component, a 76 on the symbolic component, and a 74 on the non-symbolic component, yielding a full-scale IQ score of 72. Two months later, on January 22, 2003, Dr. Goff administered the Wechsler Intelligence Scale for Children (WISC-III) to the claimant. The claimant scored a 63 on the verbal component and a 71 on the performance component, yielding a full-scale IQ score of 63. (R. 412-13).

On March 27, 2009, Roger D. Hunter, M.S., a licensed professional counselor administered the Universal Nonverbal Intelligence Test to the claimant, who was around eighteen years old at the time, at the request of the claimant's school. The purpose of this test was to provide insight into the appropriate academic placement for the claimant.  Mr. Hunter reported that the claimant was cooperative, that his level of motivation was good, and that he appeared to provide his best effort. The claimant received a full-scale IQ score of 82 on the test, placing him in the 12th percentile of the general population. He scored an 88 on the memory component, a 79 on the reasoning component, an 85 on the symbolic component, and an 82 on the non-symbolic component. Based on these results, Mr. Hunter stated that there was a 90%

probability that the claimant's IQ score fell between 77 and 89. Mr. Hunter affirmed his belief that these test results were valid and reliable and concluded that the claimant would be successful in a mainstream classroom. (R. 244-45).

From 2010-2012 when he was around nineteen and twenty years old, the claimant received medication and counseling for his attention deficit hyperactive disorder and his intermittent explosive disorder. In his progress notes, Dr. Douglas observes that the claimant was becoming less prone to "explosive" anger. (R. 343).

Throughout 2016, the claimant underwent talk therapy with a clinical social worker, who relayed the claimant's positive report on his ability to manage his anger. The claimant stated that he was doing well and that his symptoms had improved.  According to treatment records, the claimant also stated that he had worked out his anger issues. However, the claimant experienced increased anger in April 2017, though his symptoms appeared to improve after his medications were increased in October 2017. (R. 481-492).

After filing an application for supplemental social security income, the claimant had a consultative examination on June 5, 2016 with Dr. Nina E. Tocci at the request of the Social Security Administration. Dr. Tocci noted that the claimant appeared appropriately groomed, displayed sad facial expressions and fleeting eye contact, and exhibited a cooperative attitude toward the examiner. She described the claimant's affect as appropriate, normal, and stable. Dr. Tocci also observed that the claimant exhibited fair social judgement in his consideration of two hypothetical social dilemmas.  (R. 402).

Dr. Tocci found that the claimant demonstrated "poor fund of information and comprehension." The claimant incorrectly stated the number of days in a year, the number of

7

months in a year, the number of quarters in a dollar, and the number of items in a dozen. The claimant also incorrectly stated the animal from which wool is derived.

Dr. Tocci also assessed the claimant's memory and concentration. The claimant could repeat three words and recall them after five- and thirty- minute intervals. He could repeat six digits forward and four digits backwards. While the claimant could identify the current President of the United States, he could not identify the last President of the United States or the current Governor of Alabama. Dr. Tocci observed that the claimant demonstrated fair concentration, but could not calculate change and could not perform "serial threes" backwards or "serial fours" forward. The claimant could spell "world" and "earth" forward, but could not spell these words backwards. The claimant could name five animals, but could not name five colors. Dr. Tocci observed that the claimant appeared to be functioning within "the borderline range of intellectual disability." (R. 403).

Dr. Tocci also reported on the claimant's daily life and activities. She noted that the claimant typically does nothing during the day "except clean up and stuff." She further noted that the claimant attends church and has a driver's license but no car. Dr. Tocci reported that, during the examination, the claimant stated that the longest he has held a job was for two weeks and that he has been fired on several occasions because of his ADHD symptoms. Dr. Tocci's diagnostic impressions were that the claimant had ADHD and an adjustment disorder with disturbance of conduct. (R. 402, 403).

On June 30, 2016, Dr. Tocci administered the Weschler Adult Intelligence Scale to the claimant. The claimant received a verbal comprehension score of 68, a perceptual reasoning score of 71, a working memory score of 63, and a processing score of 81, yielding a full-scale IQ

score of 59. Dr. Tocci deemed these results invalid, however, because the claimant reportedly rushed directions and models and evinced limited effort. (R. 408).

Following the ALJ hearing, the Social Security Administration requested that the claimant undergo another consultative evaluation. Dr. Donald W. Blanton examined the claimant on March 28, 2018.  Dr. Blanton observed that the claimant was appropriately dressed and exhibited normal affect. The claimant complained of anxiety, but was not visibly anxious. However, Dr. Blanton also stated that the claimant reported depressed mood and previous episodes of suicidal thoughts. The claimant also reported visual hallucinations prior to taking medications. Dr. Blanton found that the claimant could name the President of the United States and perform arithmetic using his fingers. Based on his examination, Dr. Blanton estimated that the claimant's intelligence was far below average and that his judgement was ill-suited for work and financial decisions. (R. 576).

Dr. Blanton also reported on the claimant's daily activities. According to Dr. Blanton's notes, the claimant lives with his family and has no other friends. He is able to cook and clean, and spends most of his day watching television. He attends church and occasionally shoots a basketball in the yard. He does not attend parties or clubs, cannot handle money well, and has a cell phone, but does not know how to text.

Dr. Blanton concluded that the claimant had marked limitations in his ability to understand and remember complex instructions, carry out complex instructions, and to make judgements on complex work-related decisions. Additionally, Dr. Blanton found that claimant had marked limitations in his ability to interact with coworkers and supervisors. (R. 576, 578-79).

On December 18, 2018, after the ALJ's decision, Dr. Goff examined the claimant at the claimant's attorney's request. Dr. Goff's report was submitted to the Appeal Council as part of the claimant's request for review, but the Appeals Council denied the claimant's request.

During Dr. Goff's examination, the claimant stated that his jobs do not last long because he is "too slow." Dr. Goff noted the claimant had a history of struggling to get along with others and "meltdowns," which resulted in the claimant's prior diagnosis of intermittent explosive disorder.  Dr. Goff observed that the claimant demonstrated sparse, awkward discourse.

Dr. Goff found that the claimant lived a sedentary and isolated existence and had at most one friend outside of his family. Dr. Goff further noted that the claimant omitted some letters when reciting the alphabet, was unable to perform serial three addition, and had poor memory for verbal material.

Dr. Goff administered the Weschler Adult Intelligence Scale to evaluate the claimant. The claimant received a verbal comprehension score of 70, a perceptual reasoning score of 69, a working memory score of 66 and a processing speed score of 76, yielding a full-scale IQ score of 65. (R. 17). Dr. Goff's final assessment was that the claimant had an intellectual disability, was on the autistic spectrum, and had extreme limitation in his ability interacting with others.

*The ALJ Hearing*

After the Commissioner denied the claimant's request for supplemental security income, the claimant received a video hearing before an ALJ on February 9, 2018.  At the hearing, the claimant testified that he previously worked at a paper mill. The claimant explained that he conducted a variety of simple tasks at the paper mill, including stacking heavy boxes of paper. However, the claimant testified that he had difficulty getting along with others while working at the paper mill. He stated that he was fired, but he was not exactly sure of the reasons for his

termination. He asserts that he cannot find another job because he cannot adjust to new people. (R. 51, 55, 56, 69).

The claimant lives in a mobile home with his mother, father, brother, nephew, and cousin. He testified that he has no friends outside of his family members. The claimant's days consist of sitting at home and watching television. The claimant said that he will watch whatever show he find interesting, as well as movies and football. The claimant uses Facebook to communicate with family members, but does not use Snapchat or Instagram. He does not play video games, and claims never to have taken an interest in them. The claimant sometimes cleans, but does not know how to cook. (R. 48, 56-60).

The claimant testified that he failed his high school graduation exam on eight separate occasions. He stated that he was able to graduate with a "credit-based diploma." After high school, the claimant went on to take a certificate program in auto body repair at community college. He attended twice a week for two years and successfully completed the program. While in college, the claimant also obtained his driver's license. The claimant noted that the driving portion of the test was difficult for him and that he needed several attempts to pass. He answered the written component of the driving test orally. The claimant testified that while he was in college his mother drove him to school and that he now drives about twice a week.  (R. 50, 63, 65).

The claimant has undergone mental health treatment for behavioral issues. He testified that he continues to receive mental health treatment and take Adderall and Invega for his conditions. By claimant's own account, Invega helps him control his anger. He receives an Invega injection every month from Dr. Fisher's clinic. The claimant testified that he had never been arrested, but he did recall one outburst of anger that led to the police being called on him.

The claimant stated that he was upset and probably yelling, but that he did not engage in any physical aggression. The ALJ noted that the claimant had also exchanged blows with his brother and father in 2011. When the ALJ asked about the incident, the claimant stated that he did not remember any altercation.  (R. 50, 53, 60, 61, 64, 65).

The claimant testified that his reading, writing, and mathematical abilities were limited. He noted that his mother handles whatever money he earns. When the ALJ asked the claimant how many dollars he would have if he subtracted six dollars from thirteen dollars, the claimant stated that he did not know the answer and he guessed incorrectly. When the ALJ asked the claimant if he thought he could work, the claimant replied that getting along with others was difficult. (R. 51, 59 62, 63, 64).

Lastly, a vocational expert, Mr. Steve Cosgrove, testified concerning the type and availability of jobs that individuals similarly situated to the claimant could perform. The ALJ asked Mr. Cosgrove to consider an individual with the same age, education, and work experience as the claimant. She asked Mr. Cosgrove to assume the individual has the following limitations: limited to performing simple, routine, and repetitive tasks; able to frequently interact with supervisors, occasionally interact with coworkers, and never interact with the public; able to have normal breaks; and not able to perform production rate work or assembly work. The ALJ then asked what jobs this individual could perform. (R. 70-71).

Mr. Cosgrove replied that the individual could do the work of an unskilled general laborer, which she characterized as heavy work with an SVP of 1. He also added that the claimant could be a hand packer/packager, with 84,00 positions nationwide; a kitchen helper, with 274,000 positions nationwide; or a warehouse worker, with 42,000 positions nationwide. Mr. Cosgrove also added that the individual could still do these jobs if he missed one day per

month for non-medical reasons. In response to follow-up questions by the attorney, Mr.

Cosgrove also stated that the individual in question could not do the jobs he listed if could not

deal with co-workers, follow simple instructions, or deal with changes in the work setting.

Additionally, Mr. Cosgrove testified that the individual would not be able to hold a job without

being able to maintain concentration and adequate pace for two hours. (R. 70-74).

After the hearing, the claimant requested that the ALJ order a comprehensive

psychological evaluation and objective IQ testing. (R. 240).

*The ALJ Decision*

On October 22, 2018, the ALJ denied the claimant's request for further psychological

evaluation and issued a decision that the claimant was not disabled under the Social Security Act.

First, the ALJ determined that the claimant had not engaged in substantial gainful activity since

his alleged onset date, June 15, 2015. The ALJ noted that the claimant's earnings after his

alleged onset date must exceed $1090 a month in 2015, $1130 a month in 2016, and $1170 a

month in 2017 to constitute substantial gainful activity. The claimant's actual earnings after his

alleged onset date fell short of this mark: the claimant earned $129 a month in 2015, $363 a

month in 2016, and $678 a month in 2017. Thus, the ALJ concluded that the claimant had not

engaged in substantial gainful activity since his alleged onset date. (R.29-30).

Next, the ALJ found that the claimant had severe impairments of attention deficit

hyperactivity disorder (ADHD), explosive personality disorder, and intellectual disorder.

However, the ALJ determined that the claimant did not have an impairment or combination of

impairments that met or medically equaled the severity of an impairment listed in 20 CFR Part

404, Subpart P that deal with intellectual, personality and impulse control, and

neurodevelopment disorders.

The ALJ first assessed whether the claimant's mental impairments met the "paragraph B" criteria under Sections 12.05, 12.08, and 12.11. The ALJ found that the claimant's mental impairments did not constitute any extreme or marked limitations in any of the specified areas of mental functioning. Regarding understanding, remembering, and applying information, the ALJ found that the claimant exhibited only a moderate limitation. The ALJ supported this conclusion by citing evidence that the claimant could drive and play basketball; perform simple arithmetic, spelling, and recall exercises; and could pass an orally administered driver's license test. (R. 30).

Regarding claimant's ability to interact with others, the ALJ concluded that the claimant had only a moderate limitation. The ALJ supported this conclusion with evidence that the claimant attended church twice a week and lived with others. Furthermore, the ALJ pointed out that the claimant takes care of four dogs, has good relationships with his family, and appeared cooperative and comfortable with his psychological evaluators. Finally, the ALJ noted that the claimant responded well to medication and therapy for his anger management.  (R. 30).

Turning to the claimant's ability to concentrate, persist, and maintain pace, the ALJ determined that the claimant had only a moderate limitation in this area. The ALJ highlighted the fact the claimant is able to drive by himself, watch T.V., play games, and attend church twice a week.  The ALJ also emphasized that the claimant was able to attend community college and obtain a certificate in auto body repair. Finally, the ALJ noted that the claimant takes Adderall to assist his concentration. (R. 30-31).

Regarding adapting and managing one's self, the ALJ found that the claimant had only a mild limitation. To support this conclusion, the ALJ cited the fact that claimant could manage his own self-care and personal hygiene with reminders, and get along with others. Furthermore, the

ALJ referenced evidence in the record that the claimant was appropriately groomed and cooperative when interacting with psychological evaluators. (R. 31).

Thus, the ALJ found that the claimant had only moderate limitations in each of the four areas of mental functioning specified in paragraph B. The ALJ concluded that because the claimant had no marked or extreme limitations in those areas, his mental impairments did not meet the paragraph B criteria for Sections 12.05, 12.08, and 12.11. (R. 31).

The ALJ found that the claimant's condition did not satisfy the paragraph A criteria under Section 12.05.  The ALJ first determined that the claimant's mental impairments did not demonstrate below-average intellectual functioning through cognitive inability to participate in a test of intellectual functioning. As evidence of his conclusion, the ALJ  observed that the claimant demonstrated sufficient intellectual functioning to participate in the standardized testing administered by licensed professional counselor Mr. Hunter in 2009. Additionally, the ALJ found that the claimant did not exhibit significant deficits in adaptive functioning, as evinced by dependence on others for personal needs. The ALJ determined that the claimant's adaptive functioning deficits were only mild. The ALJ supported this conclusion by citing evidence that the claimant could feed and dress himself, groom himself if given reminders, and use the restroom without assistance. Because the claimant failed to meet these requirements, the ALJ found that the claimant did not meet "paragraph A" criteria under Section 12.05. (R.31).

The ALJ then made additional findings on "paragraph B" criteria under Section 12.05. The ALJ explained that to meet the "paragraph B" criteria of Section 12.05, the claimant must have either (a) a full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence or (b) a full scale (or comparable) IQ score

of 71-75 accompanied by a verbal or performance score (or comparable part score) of 70 or

below on an individually administered standardized test of general intelligence. (R. 32).

  The ALJ determined that the claimant failed to meet this IQ requirement. To support his

conclusion, the ALJ relied on Dr. Hunter's finding that the claimant's full-scale IQ was 82.

Moreover, the ALJ found that the results of claimant's June 2016 intelligence test administered

by Dr. Tocci were not valid. The ALJ concurred with Dr. Tocci's assessment that the claimant

did not apply adequate effort during the test to render the result accurate. Furthermore, she found

that the results of the test, which indicated claimant's full-scale IQ score was 59, were

inconsistent with other evidence in the record, including his educational background, subjective

function report, and hearing testimony. (R.32).

  Next, the ALJ determined that the claimant has the residual functional capacity to

perform a full range of work at all exertion levels, but with the following nonexertional

limitations: can perform simple, routine repetitive tasks; can make simple work-related

decisions; can have frequent contact with supervisors, occasional contact with coworkers, and no

contact with public; can be accommodated with normal breaks; and cannot perform production

rate or assembly work. In making this finding, the ALJ stated that she considered the claimant's

symptoms and the extent to which these symptoms were consistent with other evidence in the

record.  The ALJ found that the claimant's medically determinable impairments could be

reasonably expected to cause his symptoms. However, the ALJ found that the claimant's

statements concerning the intensity, persistence, and limiting effects of these symptoms were

inconsistent with medical and other evidence in the record.(R. 32-33).

  First, the ALJ pointed out various aspects of the claimant's daily life, work experience,

and education that suggest a greater degree of functional capacity than the claimant alleged.

Regarding the claimant's daily activities, the ALJ noted that the claimant can complete chores when reminded, drive himself to work, shop for food and shoes, count change, and care for dogs. The ALJ also noted that claimant enjoys television, attends church, and has good relationships with his family, with whom he often interacts in person and via Facebook. Regarding claimant's work experience, the ALJ observed that while claimant had not performed work that amounted to substantial gainful activity, he did manage to work in a paper mill and a car factory. Additionally, the ALJ pointed out that the claimant earned a certificate in auto body repair in community college and maintained a 2.38 GPA. (R. 33-34).

The ALJ also cited evidence that the claimant's symptoms have been successfully managed with medication and counseling. The ALJ referenced notes from Dr. Douglass indicating that, from 2010-2012, the claimant was becoming less prone to outbursts of anger and functioning well. The ALJ also cited evidence that talk therapy and anger management counseling with a clinical social worker had positive results on the claimant's symptoms. The ALJ further noted that, in August 2016, the claimant stated that he was doing well and that his symptoms had improved. According to treatment records, the claimant has also stated that he had worked out his anger issues. While the ALJ recognized that the claimant experienced increased anger issues in April 2017, the ALJ pointed out that those anger issues improved after the claimant's medications were increased in October 2017. The ALJ also highlighted claimant's testimony affirming that Adderall improved his ability to concentrate. (R. 34).

The ALJ placed great weight on the opinion of Dr. Blanton. Dr. Blanton noted that the claimant could do simple calculations on his fingers and understand similes and proverbs. Dr. Blanton also found that the claimant had mild limitations on his ability to understand, remember, and carry out simple task instructions and make work-related decisions. However, Dr. Blanton

found that the claimant had moderate limitations on his ability to interact with the public and to respond appropriately to usual work situations as well as changes in a routine work setting. Moreover, Dr. Blanton found that the claimant had marked limitations in his ability to interact with his supervisors and coworkers. The ALJ also highlighted that Dr. Blanton's observation that, while the claimant exhibited poor concentration, the claimant had not taken his medication before the examination and that the claimant's symptoms improved with Adderall.

The ALJ also placed some weight on Dr. Tocci's report, which did not place any specific functional limitations on the claimant, and little weight on the claimant's aunt, who reported that the claimant cannot pay attention for longer than 25 minutes, cannot handle stress well, and fights with authority. (R. 35-36).

Next, the ALJ defined the claimant's work experience, age, and education in terms of the Medical-Vocational Guidelines. The ALJ found that the claimant had no past relevant work, and therefore no potential issues with transferability of job skills to address. Additionally, the ALJ found that the claimant's age fell within the 18-49 range, making him a younger individual in the context of the Medical-Vocational Guidelines.  The ALJ also determined that the claimant has a high school education and could speak English. (R. 36).

Finally, after considering the claimant's residual function capacity, age, education, and work in relation to the Medical-Vocational Guidelines,  the ALJ identified several jobs that the claimant was capable of performing. The ALJ cited the vocational expert's testimony that the claimant could be a hand packer/packager, with 84,00 positions nationwide, a kitchen helper, with 274,000 positions nationwide, or a warehouse worker, with 42,000 positions nationwide. Thus, the ALJ concluded that the claimant was not disabled within the meaning of the Social Security Act. (R. 37).

*Evidence Submitted to the Appeals Council After the ALJ Decision*

On December 18, 2018, after the ALJ's decision, Dr. Goff examined the claimant at the claimant's attorney's request. Dr. Goff's report was submitted to the Appeal Council as part of the claimant's request for review, but the Appeals Council denied the claimant's request.

During Dr. Goff's examination, the claimant stated that his jobs do not last long because he is "too slow." Dr. Goff noted the claimant had a history of struggling to get along with others and "meltdowns," which resulted in the claimant's prior diagnosis of intermittent explosive disorder.  Dr. Goff observed that the claimant demonstrated sparse, awkward discourse.

Dr. Goff found that the claimant lived a sedentary and isolated existence and had at most one friend outside of his family. Dr. Goff further noted that the claimant omitted some letters when reciting the alphabet, was unable to perform serial three addition, and had poor memory for verbal material.

Dr. Goff administered the Weschler Adult Intelligence Scale to evaluate the claimant. The claimant received a verbal comprehension score of 70, a perceptual reasoning score of 69, a working memory score of 66 and a processing speed score of 76, yielding a full-scale IQ score of 65. (R. 17).  He assessed the claimant to have marked limitations on his ability to use judgment in detailed or complex work-related decisions and maintain attention for periods of at least two hours as well as extreme limitations on his ability to respond appropriately to supervision, co-workers, and customary work pressures.  His final assessment was that the claimant had an intellectual disability, was on the autistic spectrum, and had extreme limitation in his ability interacting with others.

# VI. **DISCUSSION**

*The Appeal's Council's Refusal to Review the ALJ's Decision*

The claimant argues that the Appeals Council erred in finding that Dr. Goff's opinion did not create a reasonable probability of changing the ALJ's decision in light of new evidence. This court agrees.

The claimant requested a review of the ALJ's decision and submitted a psychological evaluation, performed by Dr. Goff, to the Appeals Council. Dr. Goff's report includes a review of the claimant's medical record, a psychological examination, and the result of IQ tests given to the claimant. At Dr. Goff's evaluation, the claimant received a full-scale IQ score of 65 on the Weschler Adult Intelligence Scale. This result suggests that the claimant meets 12.05(B)(1), and it fills a significant evidentiary gap in the record by adding a recent IQ score.

Moreover, the claimant's score of 65 on this IQ test strengthens other evidence in the record that the claimant's IQ score is in the disabled range, including a 2003 test on which the claimant scored a full-scale IQ of 63. Thus, the submission of a new IQ score that meets 12.05(B)(1) has a reasonable probability of altering the ALJ's determination of the claimant's IQ. (R. 17-21, 244-45, 412-413).

Additionally, the IQ score provided by Dr. Goff's report in 2018 sheds significant doubt on the ALJ's assertion that the claimant's IQ score is 82. The ALJ determined that the claimant has a full-scale IQ of 82 based on a single test the claimant took in 2009. That test not only failed to measure the claimant's verbal intelligence, but was administered by a professional counselor rather than a psychologist with a doctoral degree in the field. The ALJ relies solely upon this particular test, despite the fact that it suggests an IQ significantly higher than other documented

IQ test scores. The IQ score of 65 in Dr. Goff's report adds to the evidence that the claimant's score of 82 is an outlier.

Moreover, unlike the IQ score obtained by a licensed professional counselor on which the ALJ relies, the IQ score in Dr. Goff's report was administered by a psychologist with a doctoral degree and evaluated not only nonverbal intelligence, but also verbal intelligence.  (R. 17-22, 244-45).

The IQ score in Dr. Goff's report is also more consistent with the claimant's demonstrated academic abilities. The professional counselor, on whose report the ALJ relies, predicted that, based on the claimant's IQ of 82, he "should be successful in a mainstream classroom." In fact, the claimant failed his high school graduation exam eight times and never passed it. Dr. Goff's report, therefore, adds definitive weight to the evidence that the IQ score relied upon by the ALJ is not representative of the claimant's actual intelligence. (R. 244-45).

Several other features of Dr. Goff's report also suggest that it has a reasonable probability of changing the outcome of the ALJ's decision. In the report, Dr. Goff concludes that the claimant is intellectually disabled and autistic. Moreover, Dr. Goff finds that the claimant has extreme limitations on his ability to respond appropriately to supervision, co-workers, and customary work pressures. These findings contradict evidence that the claimant was "cooperative," which the ALJ highlighted in her decision. Also, Dr. Goff's assessment of the claimant's difficulty interacting with others also comports with other evidence in the record, including the claimant's testimony that he has had the police called on him for a fit of yelling, which the ALJ failed to mention in her decision. Additionally, Dr. Goff also found marked limitations on the claimant in a number of domains of mental functioning, including the ability to use judgment in detailed or complex work-related decisions and the ability to maintain attention

for periods of at least two hours. These assessments bear directly on the requirements of Listing 12.05(B)(2) and have a reasonable probability of changing the outcome of the ALJ's decision. (R. 17-22, 61).

Dr. Goff's report also adds significant weight to the evidence of the claimant's profound intellectual difficulties. Dr. Goff formally diagnosed the claimant with an intellectual disability, and notably observed that the claimant omitted some letters when reciting the alphabet. He also noted that the claimant had a poor memory for verbal material. These results contribute to the evidence from Dr. Tocci's evaluation, largely neglected by the ALJ's decision, that the claimant's ability to understand, remember, and apply information is seriously limited. During Dr. Tocci's examination, the claimant could not correctly state the numbers of months in a year or the number of quarters in a dollar. He could not calculate change or name the last U.S President. He also failed to name five colors. Dr. Goff's assessment bolsters that of Dr. Blanton, who also diagnosed the claimant with an intellectual disability and found that the claimant had poor judgement for work-related matters. (R. 402-05, 576).

Dr. Goff's report provides the record with a recent IQ score, which it otherwise lacks. The IQ score in Dr. Goff's report corroborates other disability-range IQ scores in the record and sheds significant doubt on the IQ score relied upon by the ALJ. Additionally, Dr. Goff's report provides an account of extreme limitations on the claimant's mental function that bear directly on the ALJ's findings regarding 12.05(B)(2). The Appeals Council, therefore, erred in denying review of the ALJ's decision in light of post-hearing evidence.

## VII. **CONCLUSION**

For the reasons above, this court concludes that the decision of the commission should be REVERSED and REMANDED for action consistent with this opinion.

The court will enter a separate order in accordance with the Memorandum Opinion.

DONE and ORDERED this 20th day of November, 2020.


**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE